**UNITED STATES of America, Plaintiff,**

v.

**1,378.65 ACRES OF LAND, MORE OR LESS, SITUATE IN VERNON COUNTY, STATE OF MISSOURI; and Laurance C. Phister, et al., Defendants.**

No. 80–5001–CV–SW–1.

United States District Court,
W.D. Missouri,
Southwestern Division.

March 20, 1985.

On Motion for Reconsideration
June 12, 1985.

Robert G. Ulrich, U.S. Atty., Kenneth E. Weinfurt, Asst. U.S. Atty., Kansas City, Mo., Charles J. Brennan, Dept. of Justice,

Land & Natural Resources Div., Washington, D.C., for plaintiff.

S. Preston Williams, North Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDERS

JOHN W. OLIVER, Senior District Judge.

### I.

This case pends on defendants' "motion to amend judgment to include an award of costs, fees and expenses under 28 U.S.C. § 2412, as amended by The Equal Access to Justice Act or, in the alternative defendants' application for recovery of costs, fees and expenses against the United States under the Equal Access to Justice Act." Determination of that motion was delayed because of the pendency of appeals in the Eighth Circuit Court of Appeals in two condemnation cases consolidated on appeal as Case Nos. 82–1919, 83–1519.

After the Court of Appeals handed down its initial decision in the consolidated cases on August 14, 1984, counsel for both sides in response to Court inquiry stated that the pending motion could be decided on stipulations and the other data before the Court. Determination of the pending motion, however, was again delayed pending the Court of Appeals' grant of a rehearing in the consolidated cases.

The Court of Appeals handed down its final decision in the consolidated cases on December 28, 1984. *United States v. 341.- 45 Acres of Land, St. Louis County, Minn., Edward M. Essling* and *United States v. 234.55 Acres of Land, Union County, Ark.,* 751 F.2d 924 (8th Cir.1984). That decision substantially modified the Court of Appeals' original decision in the consolidated cases. Both parties again, after inquiry by the Court, stated that the pending motion should be decided on the present record.

### II.

The parties stipulated to the following facts which we adopt as findings of fact:

1. The total fees and expenses appropriate to be awarded in this action to defendants should they prevail on their pending motion filed herein on May 2, 1984, is $22,-380.

2. On December 6, 1978, the government extended an offer to the landowners in this case in the amount of $140,000. Subsequently, on August 8, 1979, the government extended to the landowners a final settlement offer in this case in the amount of $211,000.

3. On August 8, 1979, the landowners advised the government that they thought they could obtain an additional $100,000 over the appraisal of $211,000 if they went to Court.

4. Upon the trial of the issue of just compensation in this case, the landowners were awarded damages in the total amount of $325,000, said amount representing $114,000 more than the government's final settlement offer made to the landowners.

5. The appraisers employed and used by the government in this case, namely, James L. Sawyers, Oliver L. Dane and Allen Clark, have been used and employed by the government in numerous other condemnation cases and have regularly appraised property for the government in condemnation cases.

6. The government's evidence during trial as testified to by James L. Sawyers, was that the amount of just compensation due the landowners herein was $115,000, said amount being $96,000 below the government's final settlement offer and prior estimate of just compensation.

7. The government's ability to take the easements in question herein was not actively litigated by the parties.

8. The landowners, on the date of taking and subsequently, operated the subject property as a grain farm and for the harvesting of hardwood timber.

9. The landowners do not presently live on the subject property nor did they live on the subject property on the date of taking.

10. The landowners have employed tenant farmers for the operation of the farming business on the subject property.

11. The landowners have periodically hired a commercial logger to harvest and remove hardwood timber from the subject property, and the hardwood timber so removed is sold commercially.

12. There are two sets of improvements on the subject property.

13. On the date of taking, the combined net worth of Laurance C. Phister and Alice B. Phister, husband and wife, was greater than Two Million Dollars ($2,000,000) and less than Five Million Dollars ($5,000,000). On the date of taking, Harriet T. Phister had a net worth of less than One Million Dollars ($1,000,000).

14. On the date of taking, the defendants herein had less than 500 employees employed at the farming operation.

Thomas E. Barzee, Jr., an attorney with the law firm of Williams & Barzee, filed an affidavit on September 7, 1984 which catalogued that firm's record of its trials involving the condemnation of property for the Harry S. Truman Dam and Reservoir project. That affidavit, which is attached hereto as Appendix A, detailed the consistently higher Commissioners' award as compared to the government's estimated compensation as evidenced by the deposit placed with the Court pending ascertainment of just compensation. See Rule 71A(j), Federal Rules of Civil Procedure. The increase ranges from 14% to 3,316% with 5 of the 41 awards increased over 1000% and 17 more of the awards increased over 100%. Only 7 of the awards were increased by less than 50%.

On September 7, 1984 the government filed an affidavit of B.E. Upschulte, Chief, Real Estate Division, Kansas City District, Army Corps of Engineers, in response to the Barzee affidavit. Mr. Upschulte's affidavit stated that the offers made to defendants on December 5, 1978 and August 8, 1979 were based upon an approved Appraisal and Supplemental Appraisal Report, respectively, made by Mr. Oliver L. Dane.

The affidavit further stated that Mr. Dane has testified in numerous condemnation hearings on the Truman Project after being found by the Land Commission as qualified to express his opinion concerning land values.

On October 31, 1984 the government filed a second affidavit of B.E. Upschulte. That affidavit provided information on eight separate projects in the Kansas City District and listed the years between 1965 and 1984 in which the government acquired property on each project, the total number of tracts acquired (10,560), the tracts acquired by purchase and the number of tracts acquired by condemnation (2,297). The chart included in the affidavit shows that 1,897 tracts in the Truman Project were subject to condemnation proceedings and that 1,029 of those 1,898 tracts were actually tried before the Land Commission or a Special Master. The second affidavit established that only 596 of the 1,898 tracts were settled by stipulation.

Mr. Upschulte's second affidavit also included an attached list of more specific information in regard to the 41 cases catalogued in Mr. Barzee's affidavit. That list included information for each case in regard to the deposit, the award, the percentage of award over deposit, the names of the appraisers and landowners who testified to value, the estimates of compensation, and the difference between the estimated value and the amount of the award.

The data furnished by the government established that in all 41 cases the government's testimony as to the amount of just compensation was substantially less than the Land Commission award. In only three cases was the government appraiser's testimony in regard to the amount of just compensation closer to the award than the landowner's appraiser's testimony. In all 41 cases the government's deposit at the time it filed its declaration of taking was far below the Land Commission's eventual award. In many of the cases the government offered testimony that its deposit either reflected the amount of just compensation that should be awarded or offered

testimony that an amount less than the deposit should be awarded.

As will be apparent from the list of cases which we attach hereto as Appendix B, the government, for the most part, offered testimony which attempted to justify the deposit made under the Declaration of Taking Act as the amount of just compensation to be awarded. In only a handful of cases did the government adduce testimony which recognized that the amount of the deposit did not come close to reflecting the fair market value of the tract condemned.

Mr. Oliver Dane, the government's appraiser in this case, also testified in five of the cases on the list. Mr. Dane's testimony ranged from an evaluation of $14,600 to $79,550 below the award in the five listed cases. The government did not submit any data on cases other than those catalogued by Mr. Barzee. The data presented in the government's affidavit establishes that the testimony of the government's appraisers in general and that of Mr. Dane in particular has consistently been substantially lower than the Land Commission award.

### III.

The Eighth Circuit Court of Appeals concluded in the decision of two land condemnation cases consolidated for appeal that "the EAJA does apply to condemnation actions" and that "for purposes of § 2412(d) the term 'prevailing party' may include a property owner who wins by judgment or negotiation and settlement more than the government offered or admitted liability for in a condemnation case." *United States v. 341.45 Acres of Land, supra,* 751 F.2d at 936 and 937, respectively.

The Court of Appeals further concluded that, dependent upon the totality of the prelitigation and trial circumstances of the case, the government's position in refusing to offer more money as just compensation could, in a particular case, be said to be substantially justified "if its offer is consistent with appraisals upon which the government is *reasonably* entitled to rely." (Emphasis ours) *Id.* at 942. The Court of Appeals reaffirmed and quoted the stan-

dard stated in *Foley Construction Co. v. United States Army Corps of Engineers,* 716 F.2d 1202, 1204 (8th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984) that "'the test of whether the position of the United States is substantially justified is essentially one of reasonableness in law and in fact. The government bears the burden of proving the substantial justification of its position.'" *United States v. 341.45 Acres of Land, supra,* 751 F.2d at 940. The Court of Appeals remanded both cases for further proceedings consistent with the Court of Appeals' opinion that each case be determined on the particular facts presented.

The Court of Appeals made clear, however, that in determining whether the government has carried the burden of proving substantial justification of its position, "[a]ny substantial disparity between the offer, the appraisals, and the government's trial evidence should be explained by the government." *Id.* at 940. The Court of Appeals concluded that, on remand, the "district court should also consider whether the government acted reasonably in relying upon the valuations of its appraisers and expert witnesses." *Id.* at 940.

The ultimate questions presented by the pending motion in the case at bar are whether the government's position was substantially justified, whether it acted reasonably in relying upon the valuations of its appraisers and expert witnesses, and whether the government has adduced a credible explanation of the substantial disparities between the government's offer, its appraisals and its experts' trial testimony as established by the stipulated factual circumstances of this particular case. We find and conclude that all those questions must be answered in the negative for reasons we shall state in detail.

### IV.

■ We conclude as a matter of law that the EAJA does apply to this action. We further conclude that the landowners were prevailing parties for purposes of Section 2412(d) in that they recovered $114,000

more than the government's final offer as just compensation for the property taken. The burden of justification and explanation thus shifted to the government.

■ The government offered the landowners $140,000 pursuant to Dane's first appraisal and later offered $211,000 pursuant to a supplemental appraisal made eight months later. The government's expert at trial, however, testified that the property should be valued at only $115,000. The Commission awarded $325,000. We find and conclude that the government has not carried the burden of substantially justifying its position and of explaining the disparities presented under the undisputed factual circumstances of this case.

The government attempts to rely on the fact that 87% of the tracts on the Truman project were not taken by condemnation. While that circumstance is commendable for its conservation of judicial resources, it is not relevant in a proceeding for an award under EAJA. The EAJA applies to "a civil action ... in any court." 28 U.S.C. § 2412(d)(1)(A). What *is* relevant is the government's litigation and prelitigation stance in regard to the particular tract condemned.

The fact that only approximately 35% of the condemnation actions were settled without trial before the Land Commission is far more telling. The fact that the government's final offer was based upon their final appraiser's report does not alone, in our judgment, establish that its position is substantially justified, as evidenced by the remand for further proceedings in *341.45 Acres of Land.*

The issue is whether it was reasonable for the government to rely upon the valuation set by Mr. Dane. The factual data presented establishes that the government's appraisers are consistently low in their valuations. Mr. Dane's personal record is of particularly debased appraisals. It is not reasonable with this "track record" that the government simply rely upon these evaluations in settlement negotiations.

The landowners were awarded $114,000 more than the government's final settlement offer. That reflects more than a sizeable miscalculation on the part of the government. Yet, it was not unforeseeable because the landowner's themselves told the government the day the last offer was made that they thought they could obtain an additional $100,000 at trial.

## V.

We believe it is appropriate that we state in some detail the reasons why the data the government submitted by way of affidavit may not properly be said to substantially justify or explain the government's position. The government's affidavit data does no more than reflect the experience of district court judges that are required to process large land condemnation dockets in regard to the settlement policies generally followed by the government in land condemnation cases. Those policies result in the trial of a much higher percentage of land condemnation cases filed than any other type of civil case.

The Director of the Administrative Office collects and publishes only a meager amount of data in regard to land condemnation cases. The Director does, however, publish a table which shows the length of time land condemnation cases pend in a particular district court. *See* Table C 6B in the various Annual Reports of the Director of the Administrative Office. Similar figures are, of course, published in regard to civil cases which omit the figures relating to land condemnation cases. *See* Table C 6A in the various Annual Reports of the Director of the Administrative Office.

Experience in the administration of both civil and land condemnation dockets establishes that district courts are able to maintain reasonable control of their civil docket for the reason that a high percentage of all civil cases, including cases in which the government is a party, are settled before trial. Some of the relatively small number of ordinary civil cases that are not settled before trial end up in the category of cases

which pend three years or over as reported in Table C 6A.

Table C 6A of the 1983 Annual Report, which contains the latest published figures, shows that on a national basis, only 6.4% of the 228,126 ordinary civil cases which were pending in all the district courts in the federal system as of June 30, 1983 had pended for three years or more. Table C 6B of the 1983 Annual Report, on the other hand, reported that 45.5% of the 3,794 land condemnation cases which pended in all the district courts in the federal system as of June 30, 1983 had been pending for three years or more.

The Western District of Missouri has long processed more land condemnation cases than any other district court in the Eighth Circuit. Indeed, this Court, over each of the past ten years, has processed one of the largest land condemnation dockets in the federal system. Examination of the Table C 6B data over the past ten years shows that only in 1983 has this district had less than 100 pending land condemnation cases on its docket in any particular year. The figures show that in 1974, 107 land condemnation dockets pended in the Western District of Missouri; in 1975—170; in 1976—189; in 1977—209; in 1978—271; in 1979—266; in 1980—213; in 1981—155; in 1982—109; and in 1983—63.

Experience gained in keeping the land condemnation docket of the Western District of Missouri in a relatively current condition and contact with other district courts that have been required to process large land condemnation dockets has established that a docket of at least 50 land condemnation cases presents an administrative challenge to a district court having that large a land condemnation docket.

The current Table C 6B in the Annual Report of the Director of the Administrative Office, reflects the performance of district courts which have carried a docket of condemnation cases as of June 30, 1983. That table shows that district courts which carried a substantial docket of at least 50 land condemnation cases had a percentage of those cases which pended for three

years or more that far exceeded the percentage of ordinary civil cases that pended in the same district court during the same period of time.

The 1983 figures for this Court, for example, show that only 2.8% of this district's 2,388 ordinary civil cases have been pending three years or more as of June 30, 1983 as contrasted with 14.3% of the 63 land condemnation cases which pended at that time. In the District of Massachusetts 13.1% of that district's 7,232 ordinary civil cases were in the three year or more categroy in contrast with 41.2% of that district's 119 three-year old land condemnation cases; in the Northern District of West Virginia 10.9% of 1,086 ordinary civil cases—33.3% of 222 land condemnation cases; Eastern District of Texas 8.2% of 3,626 ordinary civil cases—48.1% of 108 land condemnation cases; Eastern District of Kentucky 26.4% of 2,750 ordinary civil cases—66.7% of 111 land condemnation cases; Northern District of Indiana 9.4% of 2,204 ordinary civil cases—34.0% of 53 land condemnation cases; Southern District of Florida 7.6% of 4,397 ordinary civil cases— 58.5% of 1,297 land condemnation cases.

The government's response to the data contained in Mr. Barzee's affidavit suggested that "about 87% of the Truman tracts have been acquired by direct purchase, cash settlement or condemnation for title only" and that "only 13% of these lands involved a contest on the issue of just compensation." The government argued from those figures that this Court has a "remarkable record [which] reflects credit on this Court's efforts, its Commission and the service and efforts of the government."

The significant figures, however, are contained in paragraph 5 of the second affidavit of B.E. Upschulte attached to the government's response. Paragraph 5 of that affidavit shows that 1,898 tracts on the Truman Project have been subject to land condemnation proceedings in the Western District of Missouri and that as of this date 1,857 of those cases have been closed. Paragraph 5 of the affidavit, however, shows that 1,029 tracts of the 1,898

tracts were tried before the Land Commission or a Special Master and that only 596 tracts were settled by stipulation.

The government does not attempt to explain why land condemnation cases are not susceptible to a settlement ratio which would be generally consistent with the settlement ratio of an ordinary civil case. The fact that only approximately 600 land condemnation cases were settled and that over 1,000 of those cases had to be tried in this district suggests that, for some unexplained reason, the settlement policies followed by the Department of Justice in land condemnation cases differs quite substantially from that followed by the parties, including the government, in processing settlement of an ordinary civil case. The government has neither stated nor attempted to explain the policies that produce the discrepant ratio.

## VI.

The traditional position of the Department of Justice that all land condemnation cases should be tried before a jury may account for the reluctance of the Department of Justice to devise appropriate procedures for the settlement of land condemnation cases. In Section 3051, 12 Wright and Miller, *Federal Practice and Procedure* 120, it was accurately stated that "[i]t is absolutely settled that there is no constitutional right to a trial by jury in compensation cases." That section added that "[n]evertheless this had been the most usual practice when conformity with the states was required and it was and is strongly favored by the Department of Justice."

Rule 71A of the Federal Rules of Civil Procedure was promulgated to establish a uniform procedure in all federal district courts in order to avoid the confusion created by prior existing federal law which required condemnation proceedings to be conducted in conformity with State court practice. Rule 71A, however, as proposed and ultimately promulgated, effective August 1, 1951, did not attempt to make any change in the existing Declaration of Tak-

ing Act, 40 U.S.C. §§ 258a—258e, and similar statutes.

In Section 3041 of 12 Wright and Miller, *id.* at 91, it was noted that "[u]nder the Declaration of Taking Act and similar statutes, the government has long had the right to file a 'declaration of taking' along with a deposit of the sum estimated to be just compensation, and thus take possession of the land immediately." That section added that after a declaration of taking is filed "the government is free to proceed with its plans without delay, but the landowners might not receive their compensation for years." The practical consequence of the authority granted by the Declaration of Taking Act presented the potential recognized by the adage that justice delayed could result in justice denied.

Wright and Miller therefore appropriately and accurately stated that Rule 71A was promulgated for the purpose of "providing a speedy and easy procedure [which] permits landowners to receive their compensation more promptly." Those authors added that "[i]t seems not to have been generally realized that it is landowners, and not the government, who benefit from a speedy and clear procedure in condemnation cases." *Id.* at 91.

The Notes of the Advisory Committee on Rules stated in connection with its work on Rule 71A that the "Advisory Committee have given more time to this rule, including time required for conferences with the Department of Justice to hear statements of its representatives, than has been required by any other rule." The consistent and adamant position maintained by the Department of Justice, of course, was that a rule should be promulgated in a manner that would mandate that jury trials be conducted in all land condemnation cases.

The Notes commented that the "Department of Justice has twice tried and failed to persuade the Congress to provide that juries shall be used in all condemnation cases" and that the "principal ground for opposition to commissions was then based on the assertion that the commission sys-

tem is too expensive because courts allow commissioners too large compensation." Experience has established that it is quite doubtful as to whether the ground of opposition stated by the Department of Justice to the Advisory Committee was the real basis for the position taken by the Department of Justice in regard to Rule 71A.

In Section 3041, 12 Wright and Miller, *id.* at 90, the authors stated that:

The principal difficulty in drafting Rule 71A was the procedure for trial of the issue of compensation. The Lands Division of the Department of Justice wished to have a jury in every case. Others believed that the experience of the Tennessee Valley Authority demonstrated the superiority of the appointment of commissioners to assess damages. The Committee itself was divided as between these alternative proposals. As is fully discussed in section 3051, the ultimate result was a compromise, by which trial by jury is the usual method of determining compensation, but the court is given discretion to dispense with a jury and appoint commissioners instead in unusual cases.

The files and records of this Court establish that the Department of Justice vigorously opposed the appointment of a land commission in the Western District of Missouri and that it advocated that all of the numerous land condemnation cases on this Court's docket be tried before a jury. After an appropriate hearing, this Court appointed its land commission over the opposition of the Department of Justice.

Although the United States Attorney's office for this district has cooperated with this Court in an exemplary manner in processing its large land condemnation docket and has complied with both the letter and the spirit of this Court's en banc procedures regulating the trial of land condemnation cases before the Land Commission,

the Department of Justice has not changed its procedures under which only limited authorization is given to the United States Attorney's office in this district to settle land condemnation cases before trial.[1] The long standing regulations of the Department of Justice simply do not vest any meaningful discretion in a local United States Attorney in regard to the settlement of land condemnation cases with the inevitable result that the vast majority of land condemnation cases must be tried before the Commission.

The declared objective of Rule 71A that the landowner would have a speedy determination of the amount of just compensation after the government has acquired title to the land is thus defeated because of the volume of cases that must be tried under existing Department of Justice regulations. Section 3051, *id.* at 120, fn. 42, noted the observations of two law review commentators who had reviewed the Department of Justice's adamant position in regard to the use of Rule 71A land commissions rather than jury trials. Juergensmeyer, *Federal Rule of Civil Procedure 71A(h) Land Commissions: The First Fifteen Years*, 43 Ind.L.J. 677, 723, was quoted as follows: "It is equally clear from the cases, the questionnaire, and public and private statements of Department of Justice officials that the Department of Justice continues, as it has since the inception of the idea, to oppose the commission method of determining the issue of just compensation."

Paul, *Condemnation Procedure under Federal Rule 71A*, 43 Iowa L.Rev. 231, 236–237, was also cited by Wright and Miller. Those authors took note of Paul's observation that "where the landowner cannot afford to appear in court the government obtains the land at its own valuation, for the only evidence before the jury is that of the government's own paid

---

**1.** In 1979, at a time when this Court had a docket of approximately 250 land condemnation cases, the Department of Justice did authorize a temporary change in its procedures under which authorization for the settlement of land condemnation cases could be obtained on the district court level. Although those temporary procedures successfully produced a substantial reduction in this district's pending land condemnation cases by settlement, such authority was withdrawn and the Department made no change in its regulations on a permanent basis.

appraisers whose valuation, in this writer's observation, is usually less than that of disinterested witnesses." Paul added that "[o]ne cannot escape the belief that it is such results that are at the bottom of the persistent efforts of the Lands Division of the Department of Justice to obtain jury trials in all cases and to have Rule 71A amended so as to give that right." *Id.* at 121.

Existing limitations imposed by the regulations of the Department of Justice on local United States Attorney's offices which force the trial of a majority of condemnation cases obviously delay the determination of the amount of just compensation to which a landowner is constitutionally entitled. The government has made no effort either to explain or to justify the reasonableness of its regulations and settlement policies.

We do not intend to suggest that there has not been some improvement in the manner in which the government approaches land condemnation since Congress established a uniform policy on real property acquisition practice by its enactment of Title 42 U.S.C. § 4651 in 1971. That policy was established in order "to encourage and expedite the acquisition of real property by agreements with owners, to avoid litigation and relieve congestion in the courts, to assume consistent treatment for owners in the many Federal programs, and to promote public confidence in Federal land acquisition practices." The first three key policies in Section 4651 were stated as follows:

(1) The head of a Federal agency shall make every reasonable effort to acquire expeditiously real property by negotiation.

(2) Real property shall be appraised before the initiation of negotiations, and the owner or his designated representative shall be given an opportunity to accompany the appraiser during his inspection of the property.

(3) Before the initiation of negotiations for real property, the head of the Federal agency concerned shall establish an amount which he believes to be just compensation therefor and shall make a prompt offer to acquire the property for the full amount so established. In no event shall such amount be less than the agency's approved appraisal of the fair market value of such property....

The congressional history concerning those three particular statements of policy shows that the Congress recognized that: "Prior to 1960 the Corps of Engineers and a number of other agencies followed a 'one price' policy" and that "[o]ffers were made on a 'take it or leave it' basis and there were no serious efforts made to resolve reasonable differences of opinion concerning the value of property." House Report No. 91–1656, 3 U.S.Code Congressional and Administrative News, 1970, 91st Cong. 2nd Session, pp. 5850, 5871.

That Report also stated that "[t]he Corps of Engineers, the General Services Administration and a number of other agencies have followed a policy since 1960 of making an initial offer and often acquiring property at an amount below its approved appraisal of the property." *Id.* at 5872. The report further stated that after 1960: "During hearings by this Committee last year members of the Committee made it abundantly clear that the Army intepretation of the Land Acquisition Policy Act of 1960 is not in agreement with that of the Committee that drafted the language and presented it to the Congress for enactment."

The report stated that the Committee believed that the policies stated in the first three paragraphs of 42 U.S.C. § 4651 were necessary because "[a]ny policy which does not entitle the property owner to an offer of the full amount of the agency's approved value estimate, where the owner must sell, is unfair. It is fundamental that all citizens should be dealt with fairly by their government."

The government has not attempted to explain or to justify the fact that the testimony it adduced at trial in this particular case was $96,000 below the government's final appraisal and the final settlement of-

fer made in accordance therewith. It would thus seem apparent that the government took the position in this case which sought to deprive the property owner of an amount less than the full amount of the government's last appraisal. The government has failed to carry the burden of establishing that the position it took in this case was substantially justified.

## VII

. In Parts V and VI above we have taken judicial notice of certain data in the Annual Reports of the Director of the Administrative Office of the United States Courts and of matters concerning the policies followed by the Department of Justice that relate to the amount of discretion vested in the offices of the various United States Attorneys throughout the federal system in regard to their lack of authority to settle the land condemnation cases in which they appear as counsel for the government. While there may be some doubt as to whether the data and matters discussed may properly be construed as "adjudicative facts" within the meaning of Rule 201 of the Federal Rules of Evidence, we believe that the parties should be afforded an opportunity to be heard in regard to the accuracy, propriety and tenor of the matters discussed in Parts V and VI of this memorandum opinion. We shall accordingly enter an order pursuant to Rule 201(e) which will provide the parties with an opportunity to be heard in regard to the matters discussed in Parts V and VI of this memorandum opinion.

We do not believe that there is any reasonable dispute about either the length of time land condemnation cases pend on the dockets of the various district courts discussed or about the settlement policies regularly followed by the Department of Justice. We now indicate, however, that for the sake of complete accuracy, the government is granted leave to attach copies of the applicable Department of Justice regulations to its response to the order to be entered and that this Court, in turn, will incorporate those regulations as a refer-

ence by attaching the regulations as an appendix to our memorandum opinion.

## . VIII.

We find and conclude that based upon the totality of the circumstances the government has failed to meet the burden of proving its position was substantially justified. We further find and conclude that the government has failed to explain the substantial disparities between the offer, the appraisals, and the government's trial evidence as established under the undisputed factual circumstances of this case.

The landowners are therefore entitled to an award of costs, fees and expenses against the United States under the EAJA. The parties have stipulated that the appropriate amount of total fees and expenses is $22,380.00. We find and conclude that this is an appropriate amount.

Accordingly, it is

ORDERED (1) that the landowners' motion to amend judgment should be granted and that such judgment should eventually be amended to include an award for the recovery of costs, fees and expenses against the United States under the Equal Access to Justice Act in the amount of $22,380.00. It is further

ORDERED (2) that before we enter an order that the judgment should be amended, we conclude that the parties should be afforded an opportunity to be heard in regard to the accuracy, propriety, and tenor of the judicial notice taken by this Court in Parts V and VI of this Court's memorandum opinion. It is therefore

ORDERED (3) that on or before April 1, 1985, the parties shall prepare, serve, and file a response to this order which shall state whether they wish to be heard in regard to any of the matters discussed in Parts V and VI of this Court's memorandum opinion. The government shall attach copies of all applicable Department of Justice regulations to the response it shall make in its response to this order.

APPENDIX A

Tracts 10102E, 10119E–1, 10119E–2,
10119E–3, 10119E–4, 10226E
and 10226E–2

**AFFIDAVIT**

STATE OF MISSOURI

COUNTY OF CLAY

THOMAS E. BARZEE, JR., being first duly sworn on his oath states as follows:

1. That he is an attorney with the law firm of Williams & Barzee.

2. That he makes this affidavit in support of defendants' pending Motion to Amend Judgment to Include an Award of Costs, Fees and Expenses Under 28 U.S.C. § 2412, as Amended by the Equal Access to Justice Act.

3. That for many years S. Preston Williams of said law firm has been representing landowners of property condemned for the construction and implementation of the Harry S. Truman Dam and Reservoir project.

4. That the undersigned has examined all files of said law firm regarding the condemnation of property for the Harry S. Truman Dam and Reservoir project and has made the following summary of all cases tried by this law firm:

| Case No. | Title | Government's Estimated Compensation | Commissioners'[1] Award | Percentage Increase |
|---|---|---|---|---|
| 17434–1 | U.S. vs. 265.94 Acres of Land, etc. [Brownlee] | $18,500.00 | $30,000.00 | 62% |
| 18483–1 | U.S. vs. 407.23 Acres of Land, etc. [East] | 6,150.00 | 13,000.00 | 111% |
| 16697–1 | U.S. vs. 939.25 Acres of Land, etc. [Foster] | 11,700.00 | 17,500.00 | 50% |
| 16820–1 | U.S. vs. 579.36 Acres of Land, etc. [Smith] | 17,900.00 | 29,000.00 | 62% |
| 16999–3 | U.S. vs. 939.25 Acres of Land, etc. [Goan] | 66,200.00 | 105,900.00 | 60% |
| 18421–1 | U.S. vs. 1,162.65 Acres of Land, etc. [Gover] | 63,600.00 | 88,500.00 | 39% |
| 18416–1 | U.S. vs. 1,162.65 Acres of Land, etc. [Earl Johnson] | 12,150.00 | 19,000.00 | 56% |
| 18956–1 | U.S. vs. 620.65 Acres of Land, etc. [Martha Johnson] | 12,500.00 | 25,000.00 | 100% |
| 74 CV–395–W–1 | U.S. vs. 305.66 Acres of Land, etc. [Virginia King] | 34,000.00 | 71,650.00 | 111% |
| 1527 | U.S. vs. 614.50 Acres of Land, etc. [McKinzie] | 57,325.00 | 82,000.00 | 43% |
| 18481–1 | U.S. vs. 407.23 Acres of Land, etc. [Smart] | 34,000.00 | 57,000.00 | 68% |
| 18420–1 | U.S. vs. 1,162.65 Acres of Land, etc. [Stephens] | 70,500.00 | 95,000.00 | 35% |
| 73 CV–686–W–1 | U.S. vs. 135.95 Acres of Land, etc. [Wharton] | 44,000.00 | 70,000.00 | 59% |
| 75 CV–493–W–1 | U.S. vs. 192.14 Acres of Land, etc. [Birdwell] | 31,250.00 | 67,750.00 | 117% |
| 74 CV–574–W–1 | U.S. vs. 128.93 Acres of Land, etc. [Blakely] | 22,500.00 | 47,800.00 | 112% |

[1] All figures represent a commissioners' award except those marked with an asterisk (*), in which case the matter was tried to a Special Master appointed by this Court.

| Case No. | Title | Government's Estimated Compensation | Commissioner's[1] Award | Percentage Increase |
|---|---|---|---|---|
| 78–0178–CV–W–1 | U.S. vs. 114.15 Acres of Land, etc. [Demming] | 22,500.00 | 47,500.00 | 111% |
| 74 CV–685–W–1 | U.S. vs. 0.84 Acres of Land, etc. [Elva Dunham] | 2,725.00 | 3,250.00 [2] | 19% |
| 74 CV–448–W–1 | U.S. vs. 0.72 Acres of Land, etc. [Thomas Dunham] | 300.00 | 10,250.00 | 3,316% |
| 75 CV–162–W–1 | U.S. vs. 2.43 Acres of Land, etc. [Fitzhugh] | 2,430.00 | 7,870.00 | 224% |
| 74 CV–735–W–1 | U.S. vs. 357.92 Acres of Land, etc. [Foote] | 110,800.00 | 195,000.00 | 76% |
| 75 CV–324–W–1 | U.S. vs. 201.39 Acres of Land, etc. [Katherine Johnson] | 43,640.00 | 73,000.00 | 67% |
| 75 CV–651–W–1 | U.S. vs. 1.61 Acres of Land, etc. [Kiefer] | 1,000.00 | 4,350.00 | 335% |
| 74 CV–438–W–1 | U.S. vs. 144.65 Acres of Land, etc. [Park] | 33,400.00 | 60,000.00 | 80% |
| 75 CV–461–W–1 | U.S. vs. 403.140 Acres of Land, etc. [Sikes] | 99,300.00 | 161,000.00 | 62% |
| 75 CV–845–W–1 | U.S. vs. 10.26 Acres of Land, etc. [Thies] | 12,250.00 | 27,600.00 | 125% |
| 77–0685–CV–W–1 | U.S. vs. 94.20 Acres of Land, etc. [Wildlifer's Rod & Gun Club] | 14,000.00 | 34,375.00 * | 146% |
| 75 CV–673–W–1 | U.S. vs. 407.55 Acres of Land, etc. [Wisner] | 197,600.00 | 255,000.00 | 29% |
| 75 CV–158–W–1 | U.S. vs. 0.93 Acres of Land, etc. [Zeiler] | 700.00 | 11,800.00 | 1,586% |
| 78–0265–CV–W–1 | U.S. vs. 1.43 Acres of Land, etc. [Arnett] | 1,700.00 | 29,500.00 | 1,635% |
| 78–0251–CV–W–1 | U.S. vs. 324.50 Acres of Land, etc. [Bettler] | 48,000.00 | 125,000.00 | 160% |
| 77–0787–CV–W–1 | U.S. vs. 0.62 Acres of Land, etc. [Breshears] | 450.00 | 8,500.00 | 1,789% |
| 78–0337–CV–W–1 | U.S. vs. 3.12 Acres of Land [Bryant Johnson] | 2,800.00 | 32,000.00 | 1,043% |
| 76–CV–250–W–1 | U.S. vs. 10.08 Acres of Land, etc. [Katherine Johnson] | 3,500.00 | 16,700.00 | 377% |
| 78–0430–CV–W–1 | U.S. vs. 272.10 Acres of Land, etc. [Allison] | 38,300.00 | 85,000.00 | 122% |
| 78–0517–CV–W–1 | U.S. vs. 87.23 Acres of Land, etc. [Grasher] | 23,500.00 | 61,000.00 | 160% |
| 78–0617–CV–W–1 | U.S. vs. 698.80 Acres of Land, etc. [Cauthon] | 511,450.00 | 640,000.00 | 25% |

[1] All figures represent a commissioners' award except those marked with an asterisk (*), in which case the matter was tried to a Special Master appointed by this Court.

[2] Though the landowners only received a 19% increase in this case, the commissioners' award is the exact amount of just compensation testified to by the landowners' expert witness.

| Case No. | Title | Government's Estimated Compensation | Commissioners'[1] Award | Percentage Increase |
|---|---|---|---|---|
| 78–0856–CV–W–1 | U.S. vs. 33.18 Acres of Land, etc. [Northington] | 14,425.00 | 16,500.00 | 14% |
| 77–0526–CV–W–1 | U.S. vs. 65.00 Acres of Land, etc. [Taylor] | 9,750.00 | 22,800.00 * | 134% |
| 78–0168–CV–W–1 | U.S. vs. 224.20 Acres of Land, etc. [Berrey] | 56,250.00 | 88,500.00 | 57% |
| 79–0568–CV–W–1 | U.S. vs. 4.65 Acres of Land, etc. [Walker] | 1,500.00 | 8,500.00 | 467% |
| 78–5080–CV–W–1 | U.S. vs. 1,014.16 Acres of Land, etc. [Kelso] | 96,980.00 | 276,000.00 | 185% |

[1] All figures represent a commissioners' award except those marked with an asterisk (*), in which case the matter was tried to a Special Master appointed by this Court.

5. That he has not intentionally omitted any condemnation case tried by S. Preston Williams or said law firm regarding the Harry S. Truman Dam and Reservoir project, though it is possible a file has been inadvertently missed and, therefore not reviewed.

Further, affiant sayeth not.

THOMAS E. BARZEE, JR.

Subscribed and sworn to before me, the undersigned Notary Public, this 7th day of September, 1984.

Notary Public

APPENDIX B

EXHIBIT A

| CASE No. AND TITLE | DEPOSIT | AWARD | DEPOSIT | APPRAISER | COMPENSATION | DIFFERENCE [1] |
|---|---|---|---|---|---|---|
| 17494-1<br>U.S. vs. 265.94 Acres of<br>Land, etc. (Brownlee) | $ 18,500 | $ 30,000 | 62% | (G) L. Spilman<br>(L) D. Scott | $ 18,500<br>39,050 | $ 11,500<br>9,050 |
| 18483-1<br>U.S. vs. 407.23 Acres of<br>Land, etc. (East) | 6,150 | 13,000 | 111% | (G) A. Clark<br>(L) D. Scott<br>Landowner East | 6,150<br>19,250<br>25,000 | 6,850<br>6,250<br>12,000 |
| 16697-3<br>U.S. vs. 939.25 Acres of<br>Land, etc. (Foster) | 11,700 | 17,500 | 50% | (G) W. Davis<br>(L) T. Vanderpool<br>(L) D. Scott | 13,500<br>20,750<br>21,150 | 7,000<br>3,250<br>3,650 |
| 16820-1<br>U.S. vs. 579.36 Acres of<br>Land, etc. (Smith) | 17,900 | 29,000 | 62% | (G) A. Clark<br>(G) T. Flanders<br>(L) D. Scott<br>(L) T. Vanderpool | 19,745<br>19,600<br>38,100<br>38,185 | 9,255<br>9,400<br>9,100<br>9,185 |
| 16699-3<br>U.S. vs. 939.25 Acres of<br>Land, etc. (Goan) | 66,200 | 105,900 | 60% | (G) J. Forbes<br>(L) D. Scott<br>Landowner Goan | 54,900<br>130,402<br>152,900 | 51,000<br>24,502<br>47,000 |
| 18421-1<br>U.S. vs. 1,162.65 Acres of<br>Land, etc. (Gover) | 63,600 | 88,500 | 39% | (G) W. Webb<br>(L) H. Riebold<br>(L) D. Scott | 53,600<br>93,500<br>100,772 | 34,900<br>5,000<br>12,272 |
| 18416-1<br>U.S. vs. 1,162.65 Acres of<br>Land, etc. (Earl Johnson) | 12,150 | 19,000 | 56% | (G) L. Spilman<br>(L) D. Scott<br>Landowner Johnson | 12,950<br>24,875<br>26,700 | 6,050<br>5,875<br>7,700 |
| 18956-1<br>U.S. vs. 620.65 Acres of<br>Land, etc. (Martha Johnson) | 12,500 | 25,000 | 100% | (G) W. Davis<br>(L) D. Scott | 17,500<br>32,800 | 7,500<br>7,800 |
| 74-CV-395-W-1<br>U.S. vs. 305.66 Acres of<br>Land, etc. (Virginia King) | 34,000 | 71,650 | 111% | (G) J. Bergmann<br>(L) D. Scott<br>(L) H. Riebold | 36,300<br>87,633<br>85,612 | 35,350<br>15,983<br>13,962 |

| CASE No. AND TITLE | DEPOSIT | AWARD | DEPOSIT | APPRAISER | COMPENSATION | DIFFERENCE [1] |
|---|---|---|---|---|---|---|
| 1527<br>U.S. vs. 614.50 Acres of Land, etc. (McKinzie) | 57,325 | 82,000 | 43% | (G) W. Davis<br>(L) H. Riebold<br>(L) D. Scott | 52,000<br>96,500<br>99,000 | 30,000<br>14,500<br>17,000 |
| 18481–1<br>U.S. vs. 407.23 Acres of Land, etc. (Smart) | 34,000 | 57,000 | 68% | (G) W. Webb<br>(L) D. Scott<br>(L) H. Riebold | 33,500<br>70,000<br>64,250 | 23,500<br>13,000<br>7,250 |
| 18420–1<br>U.S. vs. 1,162.65 Acres of Land, etc. (Stephens) | 70,500 | 95,000 | 35% | (G) W. Webb<br>(L) C. Couthern<br>(L) D. Scott<br>Landowner Stephens | 65,000<br>141,950<br>135,600<br>155,000 | 30,000<br>46,950<br>40,600<br>60,000 |
| 73–CV–686–W–1<br>U.S. vs. 135.95 Acres of Land, etc. (Wharton) | $ 44,000 | $ 70,000 | 59% | (G) H. McGinnis<br>(L) D. Scott | $ 44,000<br>85,500 | $ 26,000<br>15,500 |
| 75–CV–493–W–1<br>U.S. vs. 192.14 Acres of Land, etc. (Birdwell) | 31,250 | 67,750 | 117% | (G) O. Dane<br>(L) D. Scott | 35,000<br>83,000 | 32,750<br>15,250 |
| 74–CV–574–W–1<br>U.S. vs. 128.93 Acres of Land, etc. (Blakely) | 22,500 | 47,800 | 112% | (G) A. Clark<br>(L) J. Hendricks, Jr. | 22,500<br>55,650 | 25,300<br>7,850 |
| 78–CV–178–W–1<br>U.S. vs. 114.15 Acres of Land, etc. (Demming) | 22,500 | 47,500 | 111% | (G) O. Dane<br>(L) D. Scott | 22,900<br>59,700 | 24,600<br>12,200 |
| 74–CV–685–W–1<br>U.S. vs. 0.84 Acres of Land, etc. (Elva Dunham) | 2,725 | 3,250 | 19% | (G) T. Flanders<br>(L) D. Scott | 1,400<br>3,250 | 1,850<br>0 |
| 74–CV–448–W–1<br>U.S. vs. 0.72 Acres of Land, etc. (Thomas Dunham) | 300 | 10,250 | 3,316% | (G) T. Flanders<br>(L) D. Scott | 1,900<br>14,350 | 8,350<br>4,100 |
| 74–CV–162–W–1<br>U.S. vs. 2.43 Acres of Land, etc. (Fitzhugh) | 2,430 | 7,870 | 224% | (G) L. Spilman<br>(L) D. Scott | 2,550<br>9,800 | 5,320<br>1,980 |

| CASE No. AND TITLE | DEPOSIT | AWARD | DEPOSIT | APPRAISER | COMPENSATION | DIFFERENCE [1] |
|---|---|---|---|---|---|---|
| 74–CV–735–W–1 U.S. vs. 357.92 Acres of Land, etc. (Foote) | 110,800 | 195,000 | 76% | (G) O. Dane<br>(L) D. Scott<br>(L) H. Riebold | 115,450<br>203,200<br>203,550 | 79,550<br>8,200<br>8,550 |
| 75–CV–324–W–1 U.S. vs. 201.39 Acres of Land, etc. (Katherine Johnson) | 43,640 | 73,000 | 67% | (G) T. Flanders<br>(L) D. Scott | 49,600<br>79,300 | 23,400<br>6,300 |
| 75–CV–651–W–1 U.S. vs. 1.61 Acres of Land, etc. (Kiefer) | 1,000 | 4,350 | 335% | (G) A. Clark<br>(L) D. Scott | 1,000<br>6,250 | 3,350<br>1,900 |
| 74–CV–438–W–1 U.S. vs. 144.65 Acres of Land, etc. (Park) | 33,400 | 60,000 | 80% | (G) W. Davis<br>(L) D. Scott | 43,300<br>65,900 | 16,700<br>5,900 |
| 75–CV–461–W–1 U.S. vs. 403.140 Acres of Land, etc. (Sikes) | $ 99,300 | $161,000 | 62% | (G) H. Kelly<br>(G) O. Dane<br>(L) D. Scott | $106,300<br>101,200<br>186,000 | $ 54,700<br>59,800<br>25,000 |
| 75–CV–845–W–1 U.S. vs. 10.26 Acres of Land, etc. (Thies) | 12,250 | 27,600 | 125% | (G) O. Dane<br>(L) D. Scott | 13,000<br>33,900 | 14,600<br>6,300 |
| 77–0685–CV–W–1 U.S. vs. 94.20 Acres of Land, etc. (Wildlifer's Rod & Gun Club) | 14,000 | 34,375 | 146% | (G) E. Kleinsorge<br>(L) D. Scott | 19,525<br>41,875 | 14,850<br>7,500 |
| 75–CV–673–W–1 U.S. vs. 407.55 Acres of Land, etc. (Wisner) | 197,600 | 255,000 | 29% | (G) J. Sawyers<br>(L) D. Scott<br>(L) H. Riebold | 194,000<br>305,700<br>294,000 | 61,000<br>50,700<br>39,000 |
| 75–CV–158–W–1 U.S. vs. 0.98 Acres of Land, etc. (Zeiler) | 700 | 11,800 | 1,586% | (G) T. Flanders<br>(L) D. Scott | 1,000<br>15,600 | 10,800<br>3,800 |
| 78–0265–CV–W–1 U.S. vs. 1.43 Acres of Land, etc. (Arnett) | 1,700 | 29,500 | 1,635% | (G) T. Hays<br>(L) D. Scott | 17,500<br>33,500 | 12,000<br>4,000 |

610

| CASE No. AND TITLE | DEPOSIT | AWARD | DEPOSIT | APPRAISER | COMPENSATION | DIFFERENCE [1] |
|---|---|---|---|---|---|---|
| 78-0251-CV-W-1 U.S. vs. 324.50 Acres of Land, etc. (Bettler) | 48,000 | 125,000 | 160% | (G) W. Davis<br>(L) D. Scott | 48,000<br>159,000 | 77,000<br>34,000 |
| 77-0787-CV-W-1 U.S. vs. 0.62 Acres of Land, etc. (Breshears) | 450 | 8,500 | 1,789% | (G) T. Hays<br>(L) D. Scott | 2,000<br>11,000 | 6,500<br>2,500 |
| 78-0387-CV-W-1 U.S. vs. 3.12 Acres of Land, (Bryant Johnson) | 2,800 | 32,000 | 1,043% | (G) T. Hays<br>(L) D. Scott | 22,500<br>37,800 | 9,500<br>5,800 |
| 76-CV-250-W-1 U.S. vs. 10.08 Acres of Land, etc. (Katherine Johnson) | 3,500 | 16,700 | 377% | (G) T. Hays<br>(L) D. Scott | 9,350<br>21,800 | 7,350<br>5,100 |
| 78-0430-CV-W-1 U.S. vs. 272.10 Acres of Land, etc. (Allison) | 38,300 | 85,000 | 122% | (G) W. Davis<br>(L) D. Scott | 50,000<br>144,500 | 35,000<br>59,500 |
| 78-0517-CV-W-1 U.S. vs. 87.23 Acres of Land, etc. (Grasher) | 23,500 | 61,000 | 160% | (G) J. Sneeringer<br>(L) D. Scott | 36,700<br>81,000 | 24,300<br>20,000 |
| 78-0617-CV-W-1 U.S. vs. 698.80 Acres of Land, etc. (Cauthon) | 511,450 | 640,000 | 25% | (G) C. Pilmer<br>(G) H. McCord<br>(L) H. Riebold<br>(L) D. Scott | 493,600<br>500,000<br>764,500<br>773,000 | 146,400<br>140,000<br>124,500<br>133,000 |
| 78-0856-CV-W-1 U.S. vs. 33.18 Acres of Land, etc. (Northington) | 14,425 | 16,500 | 14% | (G) R. Miller<br>(L) D. Scott | 7,400<br>24,150 | 9,100<br>7,650 |
| 77-0526-CV-W-1 U.S. vs. 65.00 Acres of Land, etc. (Taylor) | 9,750 | 22,800 | 134% | (G) R. Miller<br>(L) D. Scott | 13,000<br>30,200 | 9,800<br>7,400 |
| 78-0168-CV-W-1 U.S. vs. 224.20 Acres of Land, etc. (Berrey) | $ 56,250 | $ 88,500 | 57% | (G) H. Shade<br>(L) D. Scott | $ 58,900<br>109,000 | $ 29,600<br>20,500 |

| CASE No. AND TITLE | DEPOSIT | AWARD | DEPOSIT | APPRAISER | COMPENSATION | DIFFERENCE [1] |
|---|---|---|---|---|---|---|
| 79–0568–CV–W–1 U.S. vs. 4.65 Acres of Land, etc. (Walker) | 1,500 | 8,500 | 467% | (G) T. Hays (L) D. Scott | 2,500 15,600 | 6,000 7,100 |
| 78–5080–CV–W–1 U.S. vs. 1,014.16 Acres of Land, etc. (Kelso) | 96,980 | 276,000 | 185% | (G) R. Miller (L) H. Riebold (L) D. Scott Landowner Kelso | 107,000 493,400 533,115 694,460 | 169,000 217,400 257,115 418,460 |

1. The difference between the testimony and the award. G. Government's appraiser L. Landowner's appraiser

## ON MOTION FOR RECONSIDERATION

On March 20, 1985 this Court filed Memorandum and Orders ruling that the landowners' motion to amend judgment should be granted and that judgment should eventually be amended to include an award for the recovery of costs, fees and expenses against the United States under the Equal Access to Justice Act in the amount of $22,380.00. We afforded the parties an opportunity to be heard prior to entering such an order amending judgment in regard to the accuracy, propriety, and tenor of the judicial notice taken by this Court in this Court's memorandum opinion.

On March 28, 1985 plaintiff filed a motion for reconsideration of the Memorandum and Orders of March 20. On April 2, 1985 defendants filed a response to the Memorandum and Orders and reply to plaintiff's motion for reconsideration. On April 15, 1985 plaintiff filed a response to this Court's Memorandum and Orders of March 20 which included various affidavits, reports and regulations. A final reply was filed by defendants on May 30, 1985 and by plaintiff on June 7, 1985.

We have considered the suggestions filed in support of and in opposition to the memorandum opinion and plaintiff's pending motion. We conclude that orders should be entered amending judgment to include an award for the recovery of costs, fees and expenses against the United States under the Equal Access to Justice Act in the amount of $22,380.00 and denying plaintiff's motion for reconsideration.

We need add only a word in regard to one of the arguments made by the government in support of its position. The government's April 15, 1985 response makes reference to its more "recent and currently prevailing position" in regard to whether all condemnation actions should be tried before a jury. It may be assumed that the government has, at long last, had a change of heart in that regard. But that change of heart does not support the notion that the government has adopted policies which are designed to vest real authority in the United States Attorneys in charge of the condemnation docket to negotiate the settlement of condemnation cases.

For it is clear that all of the apparent authority vested by the regulations attached to the government's April 15, 1985 response is effectively limited by the real authority to settle. Section 5–4.630 of the United States Attorney's Manual (March 19, 1984) which provides that a United States Attorney may settle a land condemnation case if, but only if,

The settlement is approved in writing (the written approval to be retained in the file of the U.S. Attorney concerned) by the authorized field representative of the acquiring agency if the amount of the settlement exceeds the amount deposited with the declaration of taking as to the particular tract of land involved.

Under that regulation "the authorized field representative of the acquiring agency" rather than the United States Attorney has the real power to authorize the settlement of a land condemnation case. The track record in regard to the manner in which the power and authority have been exercised by the acquiring agency in the Truman Dam project demonstrates that the amount deposited with the declaration of taking is consistently well below the fair market value of the land. Furthermore, the agency consistently refuses, as it did in this particular case, to authorize the United States Attorney to negotiate a settlement consistent with the awards made after trial in generally comparable cases.

Accordingly, it is

ORDERED (1) that judgment should be amended to include an award for the recovery of costs, fees and expenses against the United States under the Equal Access to Justice Act in the amount of $22,380.00. It is further

ORDERED (2) that plaintiff's motion for reconsideration of the Memorandum and Orders of March 20, 1985 should be and is hereby denied.